# SUPERIOR COURT

William H. Edwards, 2nd,
    et als.,
       vs.         Eq.No.6671
David Miller, et als.

RESCRIPT.

December 2, 1924.

BARROWS, J. Bill to set aside a conveyance and appoint a receiver. Heard on bill, answer, replication and oral testimony on issues of fact.

The respondents are David Miller, his wife Sarah, their three adult children, Bernard, Henry and Samuel, and two corporations, Millers Incorporated and Miller's Sons, Incorporated, in which individually or as trustees for other members of the family who have paid nothing they own all the stock. The bill is brought with whom join certain of David's judgment creditors. At an earlier hearing on demurrer to the bill, Edwards as assignee of David was eliminated. The objection of multifariousness suggested at the hearing comes too late. It should be made before answer.

The bill seeks (a) to have a receiver appointed for Miller's Sons, Incorporated; and (b) to set aside a conveyance on November 12, 1921, by David Miller to two of his sons, which in turn was followed by a conveyance by said sons to Sarah, both conveyances being alleged to have been made without consideration. The property transferred was the homestead estate on Montgomery avenue,

Providence, wherein David, his wife and his son Samuel and wife still live, on the same terms that David and his family did prior to the conveyances.

The case was heard on nine trial days, David's evidence is very untrustworthy. Time and again we believe he did not tell the truth. The testimony of the son Samuel is untrue in spots. That of David's wife Sarah is occasionally false. She often honestly takes refuge in "don't remember." This is frequently correct on account of her ignorance of many of the transactions about which she was asked. Her information was largely what David told her. Sarah and Samuel plainly felt the call of family loyalty to David more than the call of truth when truth might be hurtful as they saw it. We do not condemn, we merely comment.

Complainants' case is made up largely of fragmental documentary evidence and circumstances from which is deduced an attempt on the part of David to delay and defraud his creditors both by the transfer above referred to and by the device of having stocmk which complainants allege was actually owned by him appear in the names of members of his family. Most of the corporate books of Miller's Sons, Incorporated, and substantially all of their records, are gone. The Millers and Carmody, their book-keeper, would have us believe they have been lost since the receiver took possession. If Carmody's testimony is true, that a certain corduroy book which would prove the financial condition of Miller's Sons, Incorporated, was in the store when Edwards took possession as receiver, we can only say that we believe that it has somehow escaped without the knowledge of Edwards, who has been most keen in attempting to lay his hands upon all the evidence in the case. We are a little doubtful of Carmody's correctness on

this point. In any event, on one or two known occasions before locks were changed, others have been in the store without Edwards' consent. We can only surmise where or why the book has gone. The books of Millers, Incorporated, have all disappeared, carried to the dump by himself, as David ultimately admitted. We have no evidence other than by the trustee in bankruptcy of David David's own story as to how Millers, Incorporated, was wound up. It is conceded that it has ceased to do business.

In order to understand the situation, it is necessary to start with the marriage of David and Sarah Miller. David and Sarah were married 32 years ago, when she was about 21 years of age. She claims to have accumulated $10,000 in the five years prior to her marriage. This money came from $2000, given to her by her folks and the balance saved during a business of five years, with another girl partner and a helper, making shirtwaists. The story of the money earned and saved in the shirtwaist business shows profits which surprise us. She denies that the $2000 was a dowry given by her parents to her husband. Immediately after the marriage she says she put all her business affairs into David's hands, giving him a power of attorney to act completely for her in all matters. He has always had full and unlimited control of all her business. She knows little about the business transacted or what he did with her money. She says she implicitly trusted him in all her business affairs. They came to Providence in 1900, after accumulating some property in New York. Here they engaged in the liquor and preserve business, at one time operating four stores. Two of these Sarah personally helped to manage. Some of these stores were unquestionably profitable. All licenses were issued to David and the business done as David

Miller & Company. Two of the stores were largely Sarah's and the others were solely David's. With some of the profits they purchased real estate, some in Sarah's name and some in David's name. There is nothing to indicate, even if the purchase money came from profits of the stores and be considered as David's money, that his gifts to Sarah were invalid or that he was unable to meet his obligations. We believe that between $20,000 and $30,000 worth of property had been acquired by Sarah prior to the time when her husband started in the tire business in 1915. At that time David, with others, engaged in business as the Broadway Tire Exchange, a corporation. On October 20, 1919, difficulties had arisen and the name was changed to Millers, Incorporated. The members of this corporation, according to David, were himself, holding 350 shares, his sons, Bernard 25 shares, and Henry 25, and two Tortorlanis ten shares each. Sarah says in return for $27,000 advanced by her to the corporation, she held in pledge David's 350 shares and Bernard's 25 shares. We see no reason to doubt this statement. The Tortorlanis shortly ceased to figure in the business. On March 28, 1921, a fire destroyed much of the stock in trade. The loss was adjusted by payment about August, 1921, of insurance amounting to $27,000, $14,000 of which evidently was taken by David for Sarah on account of her advances. Thereafter Millers, Incorporated, transferred all its property to David and ceased to do business other than kind up its affairs. Its accounts were collected by Miller's Sons, Incorporated, and netted about $13,000. This was credited to the balance of Sarah's advances and with the $14,000 above referred to and $4400 cash went to make up Sarah's payment for 314 shares of Miller's Sons, Incorporated.

In May, 1921, David's sons say they began to consider doing business as a new corporation and did not wish to be involved in their father's troubles. They hired quarters and bought some stock as Miller's Sons, Incorporated, took over some of the stock in trade of Millers, Incorporated, and received such goods as were in transit at the time of the fire to Millers, Incorporated, and undertook for a commission of 12½ per cent. to collect the outstanding accounts of Millers, Incorporated. According to the evidence about $13,000 was collected by October 29, 1921, and used as before stated, and almost immediately we find David ensconced in the new company's quarters. The boys say he is not there as a participant in the business but as one who has desk room in the office, to wind up the affairs of Millers, Incorporated.

July 25, 1921, Miller's Sons, Incorporated, filed articles of association. (Exhibit 8). While he was not an incorporator, the evidence is all to the effect that David was the chief factor in the corporation. Officially Bernard was President and Treasurer, Henry, Vice President, and Samuel, Secretary. Certain minutes of Miller's Sons, Incorporated, which are among the few papers found by the receiver and which were identified by the draftsman, Mr. Robinson, a certified public accountant, who aided the corporation to get started (Exhibits 23, 24, 25, and 26), show that on August 1, 1921, the balance of the goods and several automobiles of Millers, Incorporated, were sold by David, as president and treasurer, to himself individually for $21,157; that Miller's Sons, Incorporated, voted to issue to David 564 shares in return for goods transferred to Miller's Sons, Incorporated, by David; that David made such transfer. These goods were unquestionably Millers, Incorporated's goods, or part of them referred to in Exhibit 23. (Compare Exhibit 26). The occurrences referred to in these exhibits have completely faded from the

recollection of all the Millers. The entry of David into the circle of Miller's Sons, Incorporated, as they say, came by reason of his having desk room and transferring to their cellar the balance of Millers, Incorporated's stock, which Miller's Sons, Incorporated, did not take over. This was left in the cellar, they say, where it could be picked out by one who knew, but with nothing to distinguish it from the stock of Miller's Sons, Incorporated. The green stock certificates show that Sarah received under date of August 1, 1921, 564 shares. The Millers all say these certificates were issued on October 29th and dated back. At that time she transferred to David 250 shares. David at once began to give away his shares for love and affection to relatives, but the gift always took the form of making himself or his wife trustee for these relatives, so that full control of the stock rested in David. See stock certificates. He claims now to have divested himself of all beneficial ownership of the stock. He was engaged in much litigation over bonds he had given to release attachments and on June 14, 1923, filed a voluntary petition in bankruptcy showing that he had as assets $20 and a claim against the defunct Millers, Incorporated, of $21,000 for bills paid and owed $36,000. The cash is all the trustee has realized. No one has satisfactorily explained why Sarah should have received 564 shares. The only evidence offered is that the certificates were actually made out October 29th and dated back to August 1st for dividend purposes and that Sarah at once transferred 250 of her shares to David because her interest entitled her to only 314 shares. Under the same date of August 1st, certificates for 12 shares each, making the balance of the total capital stock of 600 shares, were issued to the three sons, Bernard, Samuel and Henry. Two of them testified that they each paid

$1200 cash for their stock and that they know the third one did likewise. No books to show such cash payments by any one can be found. David in addition to holding a power of attorney to act for Sarah, also had one to act for Samuel who was the treasurer of the corporation. The attempt to prove Sarah an active participant in the management of the business utterly failed. She endorsed some paper, perhaps arranged for some loans but her own evidence shows she made no attempt to assist in directing the business. Under all the evidence, we find David was the dominating and controlling factor in Miller's Sons, Incorporated. All others were negligible.

Mention should be made of three other white stock certificates of a wholly different type from the green certificates of stock before referred to. The white certificates are Exhibits 34, 35 and 36. One is dated August 1, 1921, for 12 shares to Bernard H.; another August 1, 1921, for 12 shares to David and transferred by him September 1, to Bernard H.; another one September 1, 1921, for 12 shares to Bernard H.

The existence of any other than the green certificates had been denied by David and was denied by Samuel who signed them as Secretary until the white ones were produced one at a time. Bernard who also signed them neither testified nor gave a deposition. David explained them later as samples. Samuel's appearance was pathetic as he singly denied the existence or issuance of any other than the green certificates. After having been twice shown to be in error, or worse, he was asked if there were any more, and said to Mr. Edwards that he didn't know until Mr. Edwards told him whether he had any more in his pocket. Edwards said he had one more. Edwards having but three, Samuel became confident no more were issued. It is difficult

to understand the existence of two sets of certificates if they were honestly issued. That the white certificates were issued August 1st is proved by Mr. Robinson. These white certificates, of which only three have been found, are certainly enough to cast grave doubt over the whole certificate ownership, as shown by the green certificates and to warrant the present attempt to show that all the stock was in reality David Miller's.

The business of Miller's Sons, Incorporated, continued until January 1, 1924, with Samuel and David the two active participants, and Henry, the salesman, on the road. At that time a fire destroyed a portion of the stock in trade. It was insured for $40,000 and an inventory taken by Samuel in December, 1923, totalled $35,749. The prices at which the inventory was taken were said to be fair by an expert. The insurance has not been adjusted and of couse the goods left after the fire are not improving with time. The books and papers of Miller's Sons, Incorporated, from which its financial condition could be ascertained, have been lost. Claims have already been filed against the receiver of between $34,000 and $36,000. The only assets consist of the claim against the Insurance Company and from $2000 to $5000 estimated worth of undestroyed stock and $667 in the bank. We have already commented on the Millers' lack of veracity and that of some of their witnesses. There is nothing available as evidence from which the solvency or insolvency of Miller's Sons, Incorporated, on February 15, 1924, definitely can be determined. Prior to the fire it evidently intended to continue to carry on business, if one may draw such inference from the execution of a five year lease. Bernard, the President and Treasurer, had moved to Kentucky two years before and ceased to be actively interested. Henry moved to New York three weeks

after the fire, went to work for another concern and ceased to be interested in Miller's Sons, Incorporated. It was Henry who never kept his stock certificate. He gave it to some of the folks but could not tell to whom—a rather scant interest in a document which showed his investment of $1200.

January 22, 1924, the only active member was David, who at that time had disposed by transfer without consideration of all his shares to himself and wife as trustee for other members of his family. His wife Sarah's and his son Samuel's interests by reason of powers of attorney he held and acted undder were absolutely under his control.

We have only sketched the picture in outline, but we have recited enough to show that the only real factor in Miller's Sons, Incorporated, practically from its inception, was David Miller. We are inclined to believe, however, that a considerable amount of Sarah's money went into the business. We have no way of knowing whether it was a loan to David or whether it was payment for stock. We are going to give her the benefit of our uncertainty and allow her claim to be the owner of $31,400 of stock. We do not believe she had much knowledge about the form of the investment. David had the full, unlimited use of all powers connected with the shares, but we are not convinced that Sarah was a mere dummy for David's ownership of these shares. There can be no doubt that the brothers as directors and stockholders of Miller's Sons, Incorporated, if they ever did, had not functioned for a long period prior to February 16, 1924, that Bernard the elected executive officer was absent from the state and had been for a long time, that the Secretary Samuel had tried to delegate his duties to David by power of attorney, that Bernard had permanently left Rhode Island, that Henry,

the vice president, had permanently left this state, and that both had utterly ceased to pretend even to manage Miller's Sons, Incorporated. Every detail of business management had long rested in David solely, who, according to his own story, had no beneficial interest and had been a hopeless bankrupt since December, 1922. He expressed hope before the Referee in Bankruptcy that he never would be able to pay his numerous creditors. Corporate management by one in such a frame of mind is not apt to prove beneficial to creditors or stockholders. The corporation clearly has not been since January 1, 1924, and is not now in condition nor can it be expected to continue to carry on business. It certainly can not pay its obligations as they mature, with litigation pending or likely over the insurance money. To permit the liquidation of the corporation by one in the frame of mind of David Miller would be to subject the creditors and any bona fide stockholders to an undue risk of wastage, either in litigation or worse. The trustee clearly has an interest in the shares of stock which David owns. In our opinion David has always been the owner of 250 shares. We believe a receiver should be appointed for Miller's Sons, Incorporated. We have little doubt that failure so to act would result in another shifting of legal entities that would render the collection of their accounts by creditors of the Miller's Sons, Incorporated, difficult if not impossible.

(b) The other question is whether the conveyance of the real estate on Montgomery avenue, where the Millers lived, should be set aside.

They have lived in these premises for many years. This property, standing in the name of David, on November 12, 1921, was given by him to his sons Bernard and Samuel. His equity, which was subject to inchoate dower right of his wife, was $10,000. David

testified that the property was conveyed so that his sons could vote on real estate, so as to impress their prospective wives that they were men of substance, so as to give them prestige in business. Henry was not included because already married and David did not like his wife. Bernard was married in January, 1922. In March the boys without consideration conveyed the property to their mother. Bernard's wife joined in the deed. The first reason for the transfer obviously was not a true one. The second had served its purpose for Bernard and his wife were disillusioned. Samuel's prospective bride perhaps no longer needed to be impressed. Sarah, the mother, did not pay or agree to pay anything at the time of the conveyance to her except one year's taxes. Some time later she loaned $700 to Bernard. Subsequently Bernard's wife said she ought to have had something for signing the deed and his mother let Bernard have $1800 more. The real reason for the original conveyance was probably a desire to impress prospective wives of Bernard and Samuel with their husbands' property and perhaps to help the boys get credit. The former has all the earmarks of David's business methods. Our doubt of the latter ground is strengthened by the boys' early conveyance to the mother. This was in March, 1922, a time when the evidence clearly shows David was being hard pressed by creditors through Tillinghast & Murdock. The conveyance to the boys was rather shaky. It appeared safer to remove the property one more step from David's creditors. As we look at the surrounding circumstances the most powerful reason for the conveyance was David's motive to get under cover before his financial obligations were fixed by the completion of the suits against him. His conception of when an obligation to pay a bill arose was shown by his testimony at one time that

some pending claim was not a legal obligation because no "verdict" had yet been obtained. The real question, therefore, is whether the conveyance by David to the sons on November 12, 1921, was with intent to hinder, delay or defraud his creditors. Respondents claim David was solvent and that as a consequence no such intent can be found. This does not follow. Solvency is not a complete defence to a conveyance if intended to take a debtor's property out of reach of his creditors. The question of intent is one of fact. If the transferror, seeing the financial storm approaching, puts his property out of his hands before the storm breaks, with intent to delay and defraud his creditors, equity will set the conveyance aside. Solvency is only evidence of honest and bona fide intent. In this case the financial situation of David Miller on November 12, 1921, was on the border line between solvency and insolvency. We do not believe his claim that he had seven or eight thousands dollars' worth of goods from which to satisfy obligations he had incurred in behalf of Millers, Incorporated. We accept his estimate of $75 as the value of these goods in the bankruptcy court as probably more nearly correct. David showed little regard for accuracy of statement as to either figures or facts. He had $7500 assets in sight and had obligations of nearly $21,200, later chancerized at over $11,000. No one can say what his shares of stock in Miller's Sons, Incorporated, were worth. He himself made a sworn return to the tax assessors of Providence in June, 1921, that he owed $52,500 and had assets outside of 40 shares of Millers, Incorporated, worth not over $5000. It is now clear the shares were worthless. The table of cases pending and judgments thereon produced by complainant shows the first of the judgments against him on the bond was entered in October, 1921, and others followed at short intervals. The desirability from David's point of view of getting under cover late in 1921 seems to us apparent. In view of David's mental processes and business standards as shown by the evidence, we can not escape the conclusion that the conveyance of the homestead property was with intent to hinder, delay and defraud his creditors and that the later deed from the sons to the mother was at David's instigation to get the property two steps out of reach of any inquisitive creditors. The deeds should be set aside, repaying to Sarah the one year's taxes paid by her.

For Complainants: Edwards & Angell, Claude R. Branch and William H. Edwards.

For Respondents: Waterman & B. West, Frank H. Wildes and Bennie Cianciarulo.

Greenlaw, Charles E. Tilley, Albert

## SUPERIOR COURT